Mrs. Don KIRKLAND, a Widow, et al., Appellants,

v.

TEXAS AND PACIFIC RAILWAY COMPANY, a Corporation, Appellee.

No. 5591.

Court of Civil Appeals of Texas.

El Paso.

Oct. 16, 1963.

Rehearing Denied Nov. 13, 1963.

John J. Watts, James D. Cunningham, Odessa, for appellants.

McDonald, Shafer, Gilliland & Davis, Paul McCollum, Odessa, Hill D. Hudson, Pecos, Wm. R. McDowell and Gerry Wren, Dallas, for appellee.

FRASER, Chief Justice.

This is an appeal from a judgment rendered by the District Court of Ector County, Texas. Plaintiffs-appellants brought suit for damages for the death of Don Kirkland and for property loss arising out of a grade crossing collision between a train owned by appellee and a tractor-trailer gasoline transport truck driven by Don Kirkland. The case was tried to a jury and judgment was rendered by the court in favor of the defendant.

The jury, in answer to special issues, found that at the time and on the occasion in question the defendant railway company's train was being operated at a speed of 72 miles per hour, and that such rate of speed was negligence and the proximate cause of the accident. The jury also found that the crossing in question was extra-hazardous. The jury then answered the issues of discovered peril in favor of the defendant railroad; and further, the jury found that deceased failed to keep a proper lookout, and that such failure was a proximate cause of the collision. The jury also found that the train was plainly visible as it approached the crossing and was in actual, hazardous proximity to the crossing before the deceased, Don Kirkland, reached a point fifteen feet from the nearest rail of the track upon which the train was approaching, and that the failure of the deceased to stop his vehicle within fifty feet and not less than fifteen feet, under the circumstances there present, was a proximate cause of the collision. The jury found damages in the sum of $4,150.00 for the partnership which owned the truck, and the sum of $37,500.00 for the other plaintiffs, who were the widow, Mrs. Kirkland, and

her minor children, and the surviving parents of the deceased.

 Appellants' first point charges the trial court with error in overruling appellants' objection to statements made by counsel for the defendant in his address to the jury. Appellants maintain that the alleged improper argument and ruling occurred as follows:

"The deposition, after Cunningham had asked him page after page of questions I finally got down to it and I asked him a question, and this was his answer, and I think it must be yours, in answer to whether he and the fireman used all possible means at hand, 'Mr. Simmons, when you saw that boy was in a dangerous spot, did you do everything on God's green earth that you could possibly do to avoid hitting him,' and his answer was, 'I sure did'. Don't convict that old man. Maybe you haven't seen him, Mr. Watts, but don't send a man who has been married to the same woman since 1924, who has held the same job on the same railroad for the same company for thirty years, and has worked for the same company since 1909. Don't send him from his retirement to his grave, and place a stain of homicide on him * * *

"MR. WATTS: (Interrupting) If your Honor please, we object to that as that is highly improper, nobody is trying to convict him of homicide, and we ask the Court to instruct the Jury not to consider it. Nobody has tried to make a complaint, or ever will.

"THE COURT: Overruled.

"MR. WATTS: Note our exception."

Appellee replies that this bill of exception was qualified by the trial court as follows:

"With reference to Mr. Hudson's argument in cause number B–17,967, styled Mrs. Don Kirkland, et al. v. Texas & Pacific Railroad Company, the Court can only certify that he made in substance the argument contained in the attached transcript of the then Official Court Reporter's notes. The Court further certifies that Mr. Watts did interrupt and make some sort of objection to Mr. Hudson's argument, the Court being unable to certify from memory, however, as to the exact point of such objection, but being of the opinion that it was at approximately the point shown on page 8 of the attached transcript, the Court likewise being unable to certify from memory the exact form of the objection or as to whether or not the sequence set out on page 8 of the attached transcript is correct, but being of the opinion that some discussion was had between Counsel and the Court which is not shown on the attached transcript."

On the basis of the above qualification by the trial court, appellee maintains that the matter is not accurately or properly before us for review, and we do feel there is some merit in its contention. The qualification of the court becomes a part of any bill of exceptions, and requires the appellate court to accept the qualified bill in its qualified form. Craddock v. Humble Oil & Refining Co., 234 S.W.2d 137 (Tex.Civ.App., n. r. e.); Cannady v. Dallas Ry. & Terminal Co., 219 S.W.2d 816 (Tex.Civ.App., n. w. h.).

It is also well established that the bill must be complete and clear and must fully set forth the matter complained of. 4 Tex. Jur.2d 39, Appeal and Error, sec. 507.

This leaves us confronted with a bill of exception wherein the court says that to the best of his recollection the matter occurred substantially as set forth in the bill. While there may be some doubt as to the completeness and necessary clarity of the bill here involved, we hesitate to say that it is entirely inadequate, in view of the fact that the court does say, in his qualification, that the argument made was substantially

the same as that set forth in the bill, and that Mr. Watts did make some character of objection to Mr. Hudson's argument. So while there may be some question as to the adequacy of this bill, we believe that it should be considered. However, we do not believe that the matter presents reversible error. The courts have always been rather strict with regard to matters taking place in the presence of the jury, but at the same time every appellate court has, of necessity to realize that in the heat and confusion of trial, especially one as serious as this, many advocates become forceful and ardent in their arguments. The courts have therefore held that the argument must have been calculated to cause, and probably did cause, a rendition of an improper verdict and judgment in order to be serious enough to warrant reversal of the case. The jury here, of course, knew they were trying a civil case and, as the bill of exceptions itself will show, the objection by Mr. Watts, apparently promptly made, stated that nobody was trying to convict the engineer of homicide, and that nobody had tried to make a complaint or ever would. This in itself should have served, at least in some degree, to advise the jury that no one was trying to ask them to convict the engineer of the commission of a homicide.

■ Language of this type has occurred many times before and the courts have been reasonably consistent in their holdings that, although this type of argument may be improper or irrelevant, it is not necessarily reversible. Appellants maintain, in their brief, that had this argument not occurred, the jury would likely have answered the issues relating to discovered peril differently, and the court would therefore have been able to write a judgment based on the provisions of the discovered peril doctrine. We do not believe this argument was strong enough to sustain this contention, and we therefore must hold that the argument, as made and reported to us by the qualified bill of exceptions, was not such as could be considered reversible error. Greeson v. Texas & Pacific Railway Co., 310 S.W.2d 615 (Tex.Civ.App., n. r. e.); Saenger v. Dallas Ry. & Terminal Co., 67 S.W.2d 351 (Tex.Civ.App., ref'd).

In Walker v. Texas Employers Insurance Association, 155 Tex. 617, 291 S.W.2d 298 (Texas Supreme Court), the court says as follows:

> "A determination of whether the error 'probably did cause, the rendition of an improper judgment' by influencing the jury to return a verdict it probably would not otherwise have returned is to be made from an examination of the record as a whole." State v. Parrish, 159 Tex. 306, 320 S.W.2d 330; Condra Funeral Home v. Rollin, 158 Tex. 478, 314 S.W.2d 277.

Therefore, we have examined the record here and find as follows: The tragedy occurred within a few minutes of eight o'clock in the morning of October 17, 1959; that the weather was clear and sunshiny; that this crossing, known as Solo crossing, had cross-arm warnings but no automatic signals; that the train was proceeding easterly. The operators of the train testified that they saw the truck approaching on this dirt road; that they were whistling for the crossing and assumed that the driver of the truck would stop, but that he never stopped in the last sixty feet before he came to the tracks. They testified that they applied the emergency brakes of the train when they saw the driver was not going to stop, but that it was too late to avoid the accident. They testified that they saw the truck twice, once before it went behind the stock pens, and then again as it came into view and came on to the tracks; that they had been whistling for four or five blocks away from the crossing.

We include herewith excerpts from the testimony of a substantial group of witnesses. We have endeavored to be as thorough as is possible and still be brief. Also included with this opinion is a photostatic copy of a location plat, described as Exhibit P–36. It will be observed from the

LOCATION PLAT

exhibits that the countryside at the scene of the accident appears to be almost completely flat and treeless.

### V. L. BRIDGES (called by plaintiffs):

Was a driver for Foremost Dairies and was proceeding toward Midland from Odessa on the highway just north of the railroad tracks, was driving about sixty miles per hour, and was a witness to the collision—said he saw Kirkland approaching railroad tracks (from the south side) and that he did not change his speed as he approached the tracks, but seemed to the witness to speed up as he got on the tracks—then saw train hit the truck—testified that he was about even with the stock pens when he heard the train whistle—that he only heard one whistle—that he saw some boxcars on the other railroad tracks but could not identify them from a picture or photograph shown him, but did testify that the pictures showed the approximate location of the cars (the record does not seem to indicate what picture was being shown to him). Voir dire examination by defendant: Testified that he thought there were three railroad tracks—did not notice whether railroad cars standing there were boxcars or stock cars, nor for sure what track the train was traveling on, but he thought it was the most northerly track. In answer to examination by plaintiffs, witness stated boxcars appeared to be like the ones in a picture being shown him—he did not know which track these cars were on. (The bill of exceptions asked whether the boxcars present on the track immediately following the accident, such as the witness saw, did or did not constitute an obstruction to the view of one approaching that track from the south going north). (Mr. Kirkland was driving from south to north across the tracks when hit). Witness answered: "I believe it would"; and further, that the cars appeared to be located in the picture as they were after the accident. On voir dire he further testified, in answer to defendant, that he did not go to the south side of the crossing in order to look and see whether the standing freight cars actually obstructed any view or not; then, on further examination, he testified that he did not know how many cars were there—that he thought there were several. He was then asked by defendant where he was when he first saw Kirkland (it was indicated on a sketch that he was on the highway at a point about even with the easterly end of the stock pens), and he testified that he looked across and saw Kirkland making the turn on the caliche road (this turn is shown on the diagram as it loops around from behind the stock pens in order to approach the tracks). The spot indicated by Mr. Bridges puts Mr. Kirkland right in the bend of the road, and before he had begun the straight strip up to the tracks. Witness further testified that just about the time he saw Kirkland the train passed him between him and Kirkland, and that it passed him just about the time he looked across the railroad tracks and down to the turn in the dirt or caliche road upon which Kirkland was traveling. He repeated that Mr. Kirkland never stopped his truck and that he actually, in his opinion, speeded up a little as he got on the tracks—that he thought the train was going at least sixty miles an hour. (Kirkland's position when seen by Bridges is shown by red letter "K" on Exh. p-34).

### W. J. DUNCAN (called by plaintiffs):

Was employee of Wright Rental Tools—was a witness to the accident—was driving employer's truck coming south on the same road Kirkland was traveling north—had already crossed the railroad tracks from north to south—saw the train coming from the west—that his truck passed Kirkland's truck at about the curve in the road as it begins to curve in order to go around the stock pens (indicated by letter "D" on sketch marked Exhibit 34)—that Kirkland was doing fifteen or twenty miles an hour—that he (Duncan) pointed back down the track as he passed Kirkland—stated that Kirkland waved back, but that the way he took it Kirkland just thought he was waving at him—stated there were some stock cars

on the track at the crossing—that he heard the train whistling when Kirkland was on the tracks—couldn't remember by looking at picture whether those were the same box cars he saw at the time of the accident, and couldn't remember whether they were located in the same place as the cars were at the time of the accident. Under cross-examination testified the weather was clear—the approaching train was about three quarters of a mile away when he crossed over the tracks and that he observed a light on the front of the train—that he didn't know how close to the crossing the train was before he noticed the whistling, nor did he know how far Mr. Kirkland was from the crossing when he (Duncan) first heard the train whistling—stated that it could have whistled without his hearing it, saying "I imagine it could, with the windows up and so much racket going on there, it could have been whistling, I don't know." Further, if the train whistled farther back from the crossing, he didn't hear it—did not know what kind of railroad cars were parked near the crossing nor which of the other two tracks the cars were on. Then, under cross-examination, his original statement was read wherein he said: "The driver waved back which we took to mean he knew what we were pointing about", and testified that that statement was made three days after the wreck. Testified again under cross-examination that Mr. Kirkland never stopped his truck at any time before the accident. Defendant then read statement of Mr. Duncan where he says there were some box cars standing on a track west, but he didn't know how far west, down the track from the crossing, and that those boxcars would block a view of a train coming from the west until they got up to a certain distance of the crossing, but he didn't know how far. Also, that from the time the truck passed them until it was struck on the crossing, the driver never did come to a stop, that he didn't know where the train was when it started whistling, but that it was whistling as it approached the crossing and hit the tank on the truck.

HAROLD LEMLEY (called by plaintiffs):

Was employee of Texas Gulf Producing Company—was a witness to the accident. On direct examination stated he did not hear any train whistling before the accident, nor any bell being rung—that he was about a third of a mile, or two and a half or three blocks, north of the train at the time of the collision. On cross-examination testified that his car windows were rolled up—did not see truck approaching crossing—just saw the accident.

KENNETH E. ESMOND (called by plaintiffs):

Is a consulting civil engineer—made scale drawings of the scene of the accident—testified it was 239½ feet from the corral or loading pens to the center of the crossing where the accident happened.

J. M. SIMMONS (portions of his deposition read by plaintiffs)

Was engineer of train involved—following is from his deposition: Stated that there were some freight cars on the spur track near the crossing—thought there were about four or five—that they were stock cars—that as he approached this crossing he was on the right side of the locomotive and could see over the tops of the parked freight cars—that he first saw Kirkland before Kirkland had reached the stock pens, then saw him again as Kirkland had passed the stock pens and was turning up to cross the railroad tracks—that it took about a mile to stop a train like his at the speed he was going—stated again that he was on the right-hand side of the cab of the locomotive and therefore closer and in better position to view than the fireman, who was on the left-hand side.

W. G. DECKER (deposition offered by defendant):

Was fireman on train involved—stated that he was on the left side of the loco-

motive and engineer on the right—that train was as least 900 feet from the crossing when he started blowing the whistle—that he blew first the usual crossing signal of two long, one short and then one long, then gave the same signal again constituting a total of eight blasts—the bell was ringing and was still ringing after the collision—that Mr. Simmons, the engineer, big-holed the engine before the impact (in other testimony it appears that to "big-hole" means to take emergency measures, such as putting on the emergency brakes, etc., to stop the train as quickly as possible)—that engineer began the emergency stopping of the train between 75 and 100 feet away from the crossing—that such a train, at that speed, would go 150 to 200 feet before you could notice a stopping even under emergency conditions, and that therefore the impact, according to his best recollection, probably happened before any effect of big-holing was noticeable—that he first saw the truck when the train was about 900 feet from the crossing, then saw the truck again when the train was about 250 feet from the crossing—that the parked freight cars and stock pens obstructed his vision—that the headlights on the locomotive were burning, which included the oscillating light—that the truck was about sixty feet from the crossing when he saw it the second time.

R. E. L. FOGLE (called by plaintiffs):

Is a retired engineer with 27 years experience as an engineer—that a train under the circumstances prevailing at the time of this accident would take about three quarters of a mile to stop—testified about mathematical reduction of speed on application of emergency or big-hole attempts to stop a train—under cross-examination further testified that if an engineer stopped a locomotive or even slowed it down every time he saw a vehicle from a distance back from the crossing, the train would never make its schedule—that he had run passenger engines before retiring—that he assumes the man is going to stop until he has gone too far to stop—that he has to do that,

and there is nothing he can do if he discovers the person or vehicle approaching the crossing is not going to stop except continue blowing the whistle and throw on the emergency application.

L. L. GERHARDT (co-plaintiff called by plaintiffs):

Witness was one of partners owning the truck destroyed in the accident—testified that he had used that crossing many years prior to the accident in his business, and his truck drivers had done likewise—that there was no train to move any freight cars when he got out to the scene of the accident; that he got out there fifteen or twenty minutes after he was called and notified that there had been an accident—stated that there were quite a few freight cars standing on both tracks west of the crossing—that a person crossing the track would have to be on the track before he could see a train coming from the west (but such answer was stricken by the court on objection from defendant)—was cross-examined by defendant as to how witness Bridges, driving the dairy truck, could have seen Kirkland if all those box cars were on the tracks as witness Gerhardt testified—he testified there was a space underneath the box cars that a person could see through—that it was possible that a person driving on the highway would have to squat and look under the box cars—that he thought such was possible and that it was very possible that that was what happened. (It is obvious from the testimony of Bridges and the sketch, including the point where Bridges was when he saw Kirkland, that Bridges was looking from the main highway southeasterly across the railroad tracks and down to the turn in the road that Kirkland was making at the time he saw him).

ELWOOD HILL (called by defendant):

Deputy Sheriff—on direct examination testified that there were some box cars on one of the sidings or side tracks next to the loading chutes—that these cars extended

west from the loading dock. Under cross-examination stated that he arrived at the scene about 8:30, which was approximately fifteen minutes after the accident—that he remained there thirty minutes, but did not see the railroad moving any box cars.

### STANLEY TROUT (called by defendant):

A resident of Midland employed by White's Inc.—was driving on the main highway at the time of the accident—saw the train quite a ways down the track prior to the collision when he himself was about three or four hundred yards east of the crossing—saw the light on the train but did not know if it was oscillating—heard the whistle on the train blowing when he was approximately a couple of hundred yards east of the crossing—that at this time the train was about an equal distance west of the crossing, in other words, that the train was whistling some 200 yards west of the crossing. Further testified as follows: "Q. Did you hear this whistle at the time of the collision? A. The whistle was even blowing at the time of the collision, all this noise, and it was kicking up quite a fuss." Did not see the truck before the collision. On cross-examination his statement was read wherein he there stated that he was 300 yards east of the impact point at the time of impact—that there was a string of railroad cars parked on a siding south of the track the train was approaching on—that these railroad cars were parked pretty close to the cross road involved which could obstruck the truck driver's view of the train approaching—estimated fifteen or twenty freight cars parked on the siding—did not see train crew move any cars while he was there at the scene.

### R. D. RAGSDALE (called by defendant):

On direct examination testified that he was employed by the Wright Rental Tool Company—witnessed the collision in question while riding in a truck with witness Duncan—that they were coming from the north going south—saw Kirkland's truck at about the curve in the dirt road where it swings around the east end of the stock pens and heads straight away toward the railroad tracks and main highway—saw the train coming from the west before he and Duncan crossed the tracks—did not know if headlight was burning—train about three-quarters of mile away—that he and Duncan motioned to Kirkland to try to make him understand a train was coming—that Kirkland "throwed up his hand and waved at us" and that he took it to mean he understood the train was coming—heard the train whistle after they passed Mr. Kirkland—that his impression was that the train whistle was blowing before Kirkland started up the little incline toward the railroad tracks, and he estimated Kirkland truck position to be 20 to 30 to 40 feet back of the track when he and Duncan heard the train whistling—that Kirkland was going about fifteen or twenty miles an hour. Under cross-examination it was brought out that in his statement made the day of the accident along with Mr. Duncan he said, "Mr. Duncan and I motioned to the Pokorny driver (Kirkland) that a train was coming and he sort of waved back at us, but I don't believe he knew we were trying to tell him about the train." Saw some steam under the engine and thought train was trying to stop or was braking—heard the train whistle before he and Duncan crossed the track but not after—that the view was obstructed for the engineer as well as the truck driver for Pokorny by freight cars on the spur track which were on the south side of the main track and to the west of the crossing; and lastly, that the reason he waved to Mr. Kirkland was because he thought the presence of the box cars on the spur would obstruct his view and he might not see the approaching train.

### J. M. SIMMONS (deposition read by defendant):

Further testimony was read from his deposition as follows: Stated that when he

saw the truck of Kirkland the train was four or five blocks west of the crossing— that he commenced blowing the whistle for the crossing and didn't do anything else until he saw that Kirkland wasn't going to stop. He testified as follows: "A. When I seen he wasn't going to stop I plugged them, give them everything I had, you know." He describes this operation as a total big-hole which, according to the record, means using everything at hand to try to stop the train. He testified: "I done everything I could do". He then yelled to the fireman indicating they were going to hit the truck—that he began big-holing the engine three or four hundred feet west of the crossing—that in addition to the regular crossing whistles he blew a bunch of short whistles, indicating he was trying to draw the attention of the truck driver. His statement is as follows: "Q. —a bunch of short ones, is that what you mean? A. Yes, drew his attention." Testified further as to how he tried to stop the train—that it would take about a mile to stop a passenger train like his at the speed he was going —that he had big-holed on similar occasions before. Further stated that when he saw truck driver approaching the crossing that, in his opinion he slowed down and then "stepped on it and then went on" and started across. Lastly, he testified as follows: "Q. Did you have any reason on earth to believe at that time that he wouldn't stop before he went on the crossing? A. I thought he would stop."

While we are naturally loath to burden this opinion with such a long résumé of facts, we feel that this case is serious enough that such a résumé is necessary. Summarizing, it will be noted that some of the witnesses heard the train whistling, saw its headlight, and all who saw Mr. Kirkland testified that he never stopped his truck at any time while he was approaching this crossing at a time when the weather was clear and sunshiny. Appellants' first point is overruled.

Appellants' second point of error complains of the trial court's action in sustaining the defendant's objection to a hypothetical question propounded by appellants to witness R. E. L. Fogle, and likewise excluding his answer. The question and answer are as follows:

"Q. (By Mr. Watts) Mr. Fogle, when you are approaching a crossing where you have box cars located in such a position that you can't see a man after you see him the first time, then they obstruct your vision to such an extent the second time you see him that he will be within sixty feet of the track whenever you are approaching. In that kind of a situation, knowing the obstruction of stock pen and box cars, and you are going 72 miles an hour and you see a truck headed in the direction of the crossing, is it customary for an ordinary and careful prudent engineer to use his air application of his brakes at that time?

"A. Yes, I would put some air on the train even without closing the throttle."

It will be immediately apparent that the question and answer are somewhat of a combination of an inquiry about custom and what an ordinary and careful prudent engineer would do at a certain time. We do not believe the trial court abused his discretion in excluding this matter, or that such exclusion, if wrong, was serious enough to be reversible error. In the first place it is not clear what particular time is meant when the engineer would apply air or brakes, as the record is clear that the operators of the defendant's train saw the truck driven by Mr. Kirkland before it passed behind the stock pens and then again after it emerged, having made the turn around the stock pens; and from the testimony of the witnesses it is obvious that at the second time the train operators saw Mr. Kirkland he was too close to the crossing, and the train itself much too close to the crossing to have stopped at the speed it was traveling. It will be remembered that Duncan and Ragsdale said the train was

probably three-quarters of a mile away when they crossed the track coming south, and this was before they met Mr. Kirkland down at the turn of the road. The witness himself (Mr. Fogle) testified that it would take approximately three-quarters of a mile to stop a train like this at the speed it was going, and he further testified as follows:

"Q. Now in running those passenger trains to make your schedule, you have got to get them out on schedule if you can?

"A. Yes, sir.

"Q. And isn't it further true that if you stop that locomotive, or even slowed it down every time you saw a vehicle from a distance back from the crossing, you just wouldn't make your schedule, that is true, isn't it?

"A. Yes, that is true.

"Q. So you assume a man is going to stop until you realize he has gone too far to stop, don't you?

"A. Yes.

"Q. You have to do that?

"A. Yes."

Appellee claims the witness' answer is unresponsive, but the witness does say "Yes" and then goes on to say what he would have done. Finally, there is no evidence that the operators of defendant's train failed to do all they could do, or all this witness would have answered they should have done, under the question and answer as contained in the bill of exceptions. In all fairness it must be conceded that the testimony by Mr. Fogle as to what he would have done under the circumstances is no indication that such would have been effective enough to prevent the accident, nor is it proof that the operators of defendant's train failed to do so, or failed to do what should have been done under the provision of the discovered peril doctrine. We repeat—this question does not pin down the time about which the questioner is inquiring, and the answer likewise fails to indicate at which time the witness himself would have applied some air to the train. Therefore, we do not feel that the exclusion of the question and the answer, as appears in the bill of exceptions, was error on the part of the court. The trial court is given considerable discretion with reference to questions of this nature, and we do not think it was here abused. Appellants' second point is accordingly overruled.

Appellants' third point is directed at the court's exclusion of Exhibit No. 18, which is a picture showing box cars and locomotives nearby the location of the accident. Appellee objected to introduction of the picture on the ground that it was cumulative and not properly reflective of the location of the box cars at the time of the accident.

We do not think the court committed error in excluding this photograph, as the record does not show that the photographer himself was able to properly authenticate the locations and objects in the picture. Appellants attempted to verify the picture by the witness Bridges, but this witness testified that he was on the highway north of the train and the box cars; that he was traveling along at about sixty miles an hour toward Midland, and that he never went south of the tracks; and it is obvious that this picture was taken south of the tracks and crossing. Bridges also testified that the passenger train passed him just before it struck Mr. Kirkland. He remained at the scene of the accident after the train had struck Mr. Kirkland and cleared the crossing. Bridges was somewhat uncertain as to which track the box cars were on, but did say that he thought they were about like they were in the picture. We do not believe that the exclusion of this photograph was error because we do not feel a proper predicate for its admission was ever laid, and it is not clear why the inclusion of this photograph would likely have changed the jury's answers to the issues of proper lookout and discovered peril. It will be remembered that all the

witnesses who saw Mr. Kirkland before the accident were unanimous in saying that he did not ever stop his struck. The jury did find this was a hazardous crossing, but we do not see how the exclusion of the photograph would constitute reversible error with regard to any of the issues or the answers thereto. No one contradicted operators of defendant's train that they did all they could do to prevent the tragedy—they had *seen* Mr. Kirkland twice as he approached the crossing; and with reference to Mr. Kirkland's keeping a proper lookout, several witnesses (called by both parties) testified that this train was approaching the crossing on a sunshiny morning from a westerly direction, with light on and whistle blowing before and during the accident. Nor is there any evidence why Mr. Kirkland did not stop or slow down as he approached the crossing. Lastly, we repeat, we do not believe that appellants were able to lay the proper predicate for the admission of the picture. We feel, therefore, that we must overrule this point.

Having overruled all of appellants' points, the judgment of the trial court is affirmed.